**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| INTERCURRENCY SOFTWARE LLC, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| STATE STREET BANK AND TRUST | ) |
| COMPANY AND STATE STREET | ) |
| CORPORATION, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

Case No. 2:24-cv-0079-JRG

**JURY TRIAL DEMANDED**

**<u>DEFENDANTS' MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION .......................................................................................................... 1

II.  LEGAL STANDARD ................................................................................................... 4

    A.   Eligibility Under § 101 ...................................................................................... 4

    B.   Sufficiency of the Pleadings .............................................................................. 6

III. THE ASSERTED CLAIMS ARE INELIGIBLE UNDER § 101 .................................. 7

    A.   The Asserted Patents' Common Specification Describes the Alleged
        Invention as Economic Activity.......................................................................... 7

    B.   Claim 1 of the '107 Patent is Representative ...................................................... 8

    C.   During Prosecution of the '107 Patent, Patentee Relied Upon the
        "Important" Parts of the Invention to Overcome Section 101 Rejections ........... 13

    D.   *Alice* Step One: The Claims Are Impermissibly Abstract .................................... 15

        1.   Fundamental Economic Concepts Are Ineligible ..................................... 16

        2.   Intercurrency's Prosecution-Based "Graphical User Interface"
            Argument Does Not Render the Claims Non-Abstract............................. 18

    E.   *Alice* Step Two: There Is No Inventive Concept in the Claims Beyond the
        Abstract Idea Itself ............................................................................................. 21

IV.  THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE
    PLAUSIBLE FACTS SUFFICIENT TO SUPPORT A CLAIM FOR
    INFRINGEMENT...................................................................................................... 24

V.   VENUE IS IMPROPER IN THE EASTERN DISTRICT OF TEXAS .......................... 26

    A.   State Street Has No Physical Place in the Eastern District.................................... 27

    B.   State Street Has No Regular and Established Place of Business Within the
        Eastern District................................................................................................... 28

    C.   State Street Exerts No Control Over any "Place" in the Eastern District of
        Texas ................................................................................................................. 29

VI.  CONCLUSION........................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    890 F.3d 1354 (Fed. Cir. 2018)................................................................................6

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    573 U.S. 208 (2014).................................................................................. *passim*

*Am. Axle & Mfg., Inc. v. Neapco Holdings*,
    967 F.3d 1285 (Fed. Cir. 2020)..............................................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................3, 6, 9, 24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................................3, 6, 24, 26

*Bilski v. Kappos*,
    561 U.S. 593 (2010)..........................................................................................2, 16

*Bot M8 LLC v. Sony Corp. of Am.*,
    4 F.4th 1342 (Fed. Cir. 2021) ............................................................................6, 25

*Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*,
    955 F.3d 971 (Fed. Cir. 2020)..................................................................................2

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*,
    778 F. App'x 882 (Fed. Cir. 2019) .......................................................................17

*Celgene Corp. v. Mylan Pharms. Inc.*,
    17 F.4th 1111 (Fed. Cir. 2021) .................................................................27, 28, 30

*Chapterhouse, LLC v. Shopify, Inc.*,
    No. 18-CV-00300, 2018 WL 6981828 (E.D. Tex. Dec. 11, 2018)...............6, 24, 25

*Content Extraction & Transmission LLC v. Wells Fargo Bank*,
    776 F.3d 1343 (Fed. Cir. 2014).........................................................................8, 10

*In re Cordis Corp.*,
    769 F.2d 733 (Fed. Cir. 1985)................................................................................28

*In re Cray Inc.*,
    871 F.3d at 1355 (Fed. Cir. 2017)...........................................................27, 28, 29, 30

*cxLoyalty, Inc. v. Maritz Holdings*,
    986 F.3d 1367 (Fed. Cir. 2021)..................................................................................20

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
    815 F. App'x 529 (Fed. Cir. 2020) ......................................................................20, 21

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016).........................................................................4, 19, 20

*Fractus, S.A. v. TCL Corp.*,
    No. 20-CV-00097, 2021 WL 2483155 (E.D. Tex. June 2, 2021)....................6, 24, 25

*In re Google LLC*,
    949 F.3d 1338 (Fed. Cir. 2020)............................................................................28, 29

*In re Greenstein*,
    774 F. App'x 661 (Fed. Cir. 2019) ...........................................................................17

*IBM Corp. v. Zillow Group, Inc.*,
    50 F.4th 1371 (Fed. Cir. 2022) ..................................................................................23

*Intell. Ventures I, LLC v. Cap. One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015)....................................................................................5

*Island Intellectual Property LLC v. TD Ameritrade, Inc.*,
    No. 21-CV-00273, 2022 WL 17080738 (E.D. Tex. Nov. 17, 2022) ....................16, 17

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*,
    66 F. Supp. 3d 829 (E.D. Tex. 2014) (Bryson, J.) ..................................................2, 17

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
    566 U.S. 66 (2012)....................................................................................................4, 5

*Miller Mendel, Inc. v. City of Anna, Tex.*,
    598 F. Supp. 3d 486 (E.D. Tex. 2022) ....................................................................5, 23

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015)........................................................................5, 16, 19

*Potter v. Cardinal Health 200, LLC*,
    381 F. Supp. 3d 729 (E.D. Tex. 2019) .........................................................................9

*PPS Data, LLC v. Jack Henry & Assocs.*,
    404 F. Supp. 3d 1021 (E.D. Tex. 2019) ...................................................9, 10, 11, 12

*RecogniCorp, LLC v. Nintendo Co.*,
    855 F.3d 1322 (Fed. Cir. 2017)....................................................................................4

*Sanderling Mgmt. Ltd. v. Snap Inc.*,
 65 F.4th 698 (Fed. Cir. 2023) ........................................................................19, 23

*SAP Am., Inc. v. InvestPic, LLC*,
 898 F.3d 1161 (Fed. Cir. 2018).................................................................16, 17, 22

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
 873 F.3d 905 (Fed. Cir. 2017)...................................................................................5

*SkillSurvey, Inc. v. Checkster LLC*,
 178 F. Supp. 3d 247 (E.D. Pa. 2016), *aff'd*, 683 F. App'x 930 (Fed. Cir. 2017) ...............5, 23

*Synopsys, Inc. v. Mentor Graphics Corp.*,
 839 F.3d 1138 (Fed. Cir. 2016)........................................................................17, 22

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
 581 U.S. 258 (2017)....................................................................................4, 27

*Trading Technologies International Inc. v. IBG LLC*,
 No. 21-CV-00273, 2022 WL 17080738 (E.D. Tex. Nov. 17, 2022) ..........................18, 19, 20

*Trading Techs. Int'l, Inc. v. CQG, Inc.*,
 675 F. App'x 1001 (Fed. Cir. 2017) ........................................................14, 19, 20

*Trading Techs. Int'l, Inc. v. IBG LLC*,
 921 F.3d 1378 (Fed. Cir. 2019).................................................................. *passim*

*Uniloc USA, Inc. v. Avg Techs.USA, Inc.*,
 No. 16-CV-00393, 2017 U.S. Dist. LEXIS 45125 (E.D. Tex. Mar. 28, 2017) ........................4

*Vervain, LLC v. Micron Tech., Inc.*,
 No. 6:21-CV-00487, 2022 WL 23469 (W.D. Tex. Jan. 3, 2022) ...........................................26

**Statutes**

28 U.S.C. § 1400.................................................................................................3, 27

35 U.S.C. § 101................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(3)........................................................................................1

Fed. R. Civ. P. 12(b)(6)........................................................................................1

## TABLE OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | U.S. Patent No. 10,062,107 ("'107") |
| B | U.S. Patent No. 10,776,863 ("'863") |
| C | U.S. Patent No. 11,449,930 ("'930") |
| D | '107 Prosecution: 2010-04-16 Response to Restriction Requirement |
| E | '107 Prosecution: 2015-01-13 Response to First Office Action (RCE) |
| F | '107 Prosecution: 2015-08-13 Response to Final Office Action in 2nd RCE |
| G | '107 Prosecution: 2016-06-09 Response to First Office Action in 2nd RCE |
| H | '107 Prosecution: 2017-05-24 Response to Final Office Action in 2nd RCE |
| I | '107 Prosecution: 2018-01-20 Response to First Office Action in 3rd RCE |
| J | '863 Prosecution: 2018-10-03 Office Action |
| K | '863 Prosecution: 2019-12-05 Terminal Disclaimer |
| L | '930 Prosecution: 2021-01-31 Response to Office Action |
| M | '930 Prosecution: 2021-01-31 Terminal Disclaimer |

Defendants State Street Bank and Trust Company and State Street Corporation (collectively, "State Street" or "Defendants") respectfully move to dismiss Intercurrency Software LLC's ("Intercurrency") Complaint (D.I. 1, "Compl.") under Fed. R. Civ. P. 12(b)(6), because the claims of U.S. Patent Nos. 10,062,107 ("'107") (Ex. A); 10,776,863 ("'863") (Ex. B); and 11,449,930 ("'930") (Ex. C) (collectively, "Asserted Patents") are ineligible under 35 U.S.C. § 101 and because Intercurrency fails to plead sufficient facts to plausibly allege a claim for relief. Defendants also move to dismiss Intercurrency's Complaint under Fed. R. Civ. P. 12(b)(3), because venue in this District is improper.

## I.     INTRODUCTION

The Asserted Patents are directed to the fundamental economic practice of trading an asset in a preferred currency and are unequivocally patent ineligible under the Supreme Court's *Alice* test. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217-19 (2014). As the Supreme Court, Federal Circuit, and this Court have confirmed repeatedly, fundamental economic activities like the one claimed here are abstract ideas (*Alice* Step One) that are not eligible for patent protection unless they claim an inventive concept that transforms the claims into something more (*Alice* Step Two). Here, Intercurrency's allegations and arguments make clear that the claims of the three Asserted Patents—which share a common specification—are directed to the same unpatentable concept: "the invention relates to methods, processes and systems for conducting security transactions in a preferred currency." Compl. ¶ 20. No factual allegations can change the legal conclusion here that the claims are abstract, non-inventive, and unpatentable.

At *Alice* step one, the asserted claims are directed to the abstract idea of trading an asset in a preferred currency, and in particular, to performing a currency exchange at the time of transaction for a security transaction, "so that a trader or investor knows exactly what profit or loss may occur with a transaction." Compl. ¶ 19. Courts have repeatedly rejected these fundamental economic

concepts as unpatentable. *See Alice Corp.*, 573 U.S. at 216 (finding concept of intermediated settlement a fundamental economic practice and patent-ineligible); *Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971, 978 (Fed. Cir. 2020) ("'Fundamental economic practices long prevalent in our system of commerce' are examples of abstract ideas, which are ineligible subject matter") (quoting *Bilski v. Kappos*, 561 U.S. 593, 611 (2010)); *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 837 (E.D. Tex. 2014) (Bryson, J.) (finding ineligible claims directed to the "unpatentable concept of currency exchange"). Here, Intercurrency's claims lack anything more than these abstract, ineligible concepts.

This is true even using Intercurrency's description of its alleged invention. In the patentee's own words, the alleged invention is no more than "a Graphical-User-Interface design that helps a trader buy and sell a stock with certainty even [sic] the currency exchange rates fluctuate rapidly." Ex. I at 16. But the Federal Circuit has held that this is not a patentable invention: "a particular graphical user interface that improves usability, visualization, and efficiency" does not confer eligibility because "[t]he claims are focused on providing information to traders in a way that helps them process information more quickly…not on improving computers or technology." *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019) ("*IBG II*"). In other words, the alleged invention "focuses on improving the trader, not the functioning of the computer," and is thus unpatentable. *Id.* at 1383.

At *Alice* step two, once the abstract idea is removed from the claims, none of what remains recites anything inventive that might transform the claims into patent-eligible subject matter. To the extent the claims recite components, those components—such as client computer[s], trading servers, currency exchange servers, and market exchange servers—are indisputably conventional, and the claims recite them to perform only their routine functions (e.g., displaying, analyzing, and

transmitting information). Indeed, the only alleged inventive concept identified by Intercurrency during prosecution is the abstract idea itself—"deriv[ing] a prevailing exchange rate from all exchange rates" and presenting this information to a trader. Ex. I at 15. But it is well-settled that "[t]he abstract idea itself cannot supply the inventive concept." *IBG II*, 921 F.3d at 1385.

To the extent the Court credits arguments by Intercurrency that the claims recite something more than the abstract idea of exchanging currency, it should nonetheless dismiss the Complaint as failing to plausibly state a claim for relief under *Iqbal/Twombly*. Intercurrency fails to allege any facts—let alone sufficient facts—to plausibly suggest that Defendants infringe any claim of the Asserted Patents. Rather, Intercurrency repeats the same boilerplate allegations as to multiple defendants in multiple prior suits without addressing any of the particular limitations it itself classified during prosecution as "important features" of the alleged invention. For example, Intercurrency argued that "one of the important features in Claim 1 [of the '107 patent] is how and when the prevailing exchange rate is derived. Claim 1 recites explicitly that the prevailing exchange rate is derived from all exchange rates obtained from the one or more currency exchange servers [and] is calculated again from all exchange rates…right before the transaction takes place." Ex. H at 17. These features—according to Intercurrency—ensure that the claims "do[] not pose a risk tying up the alleged abstract idea nor pre-empting others from using the alleged abstract idea." Ex. G at 16. But nowhere in its Complaint does Intercurrency offer any plausible facts to suggest that State Street's accused systems meet these "important features" of the claims. Intercurrency's Complaint should be dismissed.

And to the extent that the Court finds that the claims are patent-eligible under § 101 and that the Complaint alleges sufficient facts to plausibly suggest that Defendants infringe any claims of the Asserted Patents, the case cannot be maintained in this District under 28 U.S.C. § 1400(b)

and should be dismissed. Defendants are not incorporated in Texas and do not have a "regular and established place of business" in this District. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 268 (2017). To justify its choice of venue, Intercurrency alleges that five State Street employees are located within the District in Plano, Texas. But these are remote employees that do not establish a place of business in the District. Intercurrency also alleges, without any evidence, that Defendants have data servers in the District and have solicited employees to work in this District. These superficial and conclusory allegations are without merit.

## II.   LEGAL STANDARD

### A.   Eligibility Under § 101

Abstract ideas are not patentable. *See Alice*, 573 U.S. at 216-17. Rather, they are "the basic tools of scientific and technological work" and the "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71 (2012) (citation omitted). Courts apply a two-step framework "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible application of those concepts." *Alice*, 573 U.S. at 217.

**At step one**, courts "determine whether the claims at issue are directed to a patent-ineligible concept" (*id*. at 218), by "looking at the 'focus' of the claims, their 'character as a whole,'" *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). "The inquiry often is whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (citation omitted); *see Uniloc USA, Inc. v. Avg Techs.USA,*

*Inc.*, No. 16-CV-00393, 2017 U.S. Dist. LEXIS 45125, at \*18-19 (E.D. Tex. Mar. 28, 2017).[1]

At step two, courts remove the abstract idea from the claim, and search the remainder for an "'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 573 U.S. at 217-18 (alteration in original) (quoting *Mayo*, 566 U.S. at 72-73). There is nothing inventive about applying an abstract idea using "'well-understood, routine, conventional activit[ies]' previously known to the industry." *Id.* at 225 (alteration in original) (citation omitted). Where a "pen and paper version of the claimed method…could be completed," the claimed method is merely an abstract idea. *Miller Mendel, Inc. v. City of Anna, Tex.*, 598 F. Supp. 3d 486, 495 (E.D. Tex. 2022) (quoting *SkillSurvey, Inc. v. Checkster LLC*, 178 F. Supp. 3d 247, 256 (E.D. Pa. 2016), *aff'd*, 683 F. App'x 930 (Fed. Cir. 2017)). Further, claiming "[a] simple instruction to apply an abstract idea on a computer," or "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept" will not cure a patent's abstraction. *Intell. Ventures I, LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015).

Patent eligibility under § 101 is a question of law, which may be resolved on a motion to dismiss. *See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015). While courts must accept the factual allegations in the Complaint and consider them in the light most favorable to the non-moving party, "[i]n ruling on a 12(b)(6) motion, a court need not 'accept as true allegations that contradict matters properly subject to judicial notice or by exhibit,' such as the claims and the patent specification." *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (citation omitted). Thus, dismissal of the Complaint on ineligibility

---

[1] All citations omitted unless otherwise indicated.

grounds is appropriate where there is no genuine dispute of fact that the recited claim elements are "well-understood, routine, and conventional." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1356 (Fed. Cir. 2018) (Moore, J., concurring) ("*Aatrix II*").

### B.   Sufficiency of the Pleadings

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To satisfy the plausibility standard, a plaintiff must plead facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id*. Moreover, as this Court has noted, for claims directed to "hardware and software involved in an electronic transaction…system," *Fractus, S.A. v. TCL Corp.*, No 20-CV-00097, 2021 WL 2483155, at *2 (E.D. Tex. June 2, 2021), a Complaint must include more than the bare bones allegations found sufficient by the Federal Circuit in the *Disc Disease* case. *Chapterhouse, LLC v. Shopify, Inc.*, No. 18-CV-00300, 2018 WL 6981828 (E.D. Tex. Dec. 11, 2018). Rather,

> "[t]he level of detail required in any given case will vary depending upon a number of factors, including the complexity of the technology, the materiality of any given element to practicing the asserted claim(s), and the nature of the allegedly infringing device. Accordingly, a plaintiff cannot assert a plausible claim for infringement under the *Iqbal/Twombly* standard by reciting the claim elements and merely concluding that the accused product has those elements."

*Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021). "There must be some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim." *Id*.

## III.     THE ASSERTED CLAIMS ARE INELIGIBLE UNDER § 101

### A.     The Asserted Patents' Common Specification Describes the Alleged Invention as Economic Activity

The Asserted Patents share a common specification, which explains that "the invention relates to methods, processes and systems for conducting security transactions in a preferred currency, regardless of what original or market currency the securities are being traded in and where the transaction may take place." '107, 2:15-19. As described in the specification, the alleged problem in the prior art was that "[a]t the time of buying or selling the stocks, as well as during the whole period the investor held the stocks, the investor had no certain knowledge of what profit or loss he was going to get." '107, 1:53-57. Thus, "[t]here is a great need for an improved system which performs currency conversion at a transactional level so that a trader or investor knows exactly what profit or loss may occur with a transaction." *Id.*, 1:61-66. The specification further explains that "[t]he invention may be implemented in numerous ways" ('107, 2:62-63) and "[t]he detailed description of the invention is presented largely in terms of procedures, steps, logic blocks, processing, and other symbolic representations that directly or indirectly resemble the operations of data processing devices coupled to networks." '107, 4:13-17.

According to the specification, the claimed servers represent conventional financial institutions: "server 206 represents a bank [or] an exchange agency"; "server 208 represents a brokerage (e.g., Scottrade) to facilitate a transaction decided by a trader"; and "server 210 represents an asset or market exchange (e.g., NYSE), where an asset is caused to change hands." *Id*. at 4:66-5:6. Likewise, the "client machine may include…any form of desktop or laptop or server computer, handheld wireless device, or mobile phone." *Id.* at 4:49-53. The specification also concedes that "well known methods, procedures, components, and circuitry have not been described in detail to avoid unnecessarily obscuring aspects of the present invention." '107, 4:24-

27. Thus, critically, the specification does not explain *how* a prevailing exchange rate is calculated; rather, it teaches merely that "a prevailing exchange rate is obtained at **306** from a currency exchange." '107, 5:48-49. Likewise, the specification does not teach how to specially program any of the client computer, currency exchange server, trading server, or market exchange servers to perform the alleged invention, relying instead on the conventional functionality of these common components.

### B.      Claim 1 of the '107 Patent is Representative

For purposes of the § 101 analysis, Claim 1 of the '107 patent is representative of all the claims of the asserted patents because all the claims are "substantially similar and linked to the same abstract idea"—currency exchange for a security transaction. *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (citation omitted). Claim 1 of the '107 recites functional steps using conventional hardware:

> **1. A method for providing a consolidated trading platform, the method comprising:**
>
> *providing* a trading server coupled to one or more currency exchange servers and one or more market exchange servers;
>
> *receiving* in the trading server *an indicator of a preferred currency* from a trader;
>
> *causing a client computer* associated with the trader *to display at least an asset in the preferred currency* while the asset is being traded in a market currency, wherein said *causing* a client computer associated with the trader to display at least an asset in the preferred currency comprises:
>
> *determining in the trading server a prevailing exchange rate* between the preferred currency *and* the market currency, wherein the prevailing exchange rate is derived from all exchange rates obtained from the one or more currency exchange servers when the asset is displayed in the preferred currency; and
>
> *displaying all costs and fees in the preferred currency* to own or sell the asset, *wherein the all costs and fees are dynamically changed in accordance with the prevailing exchange rate* updated constantly even when a market value of the asset remains unchanged, wherein the trader has certain knowledge of what to pay for the asset, or *profit* or loss when acting on the asset;

> ***conducting in the trading server a transaction of the asset by transmitting a transaction request from the trading server to a market exchange server*** when the trader decides to proceed with trading the asset;
>
> ***receiving a settlement notification*** in the trading server when the transaction of the ***asset*** is performed by the market exchange server in accordance with conditions set by the user, wherein the conditions include a price at which the asset is traded in the preferred currency, the trading server is configured to ***calculate the prevailing exchange rate from all exchange rates obtained from the one or more currency exchange servers right before the transaction takes place*** when the asset is not priced in the preferred currency, and executes the transaction with the calculated prevailing exchange rate obtained at the transaction to prevent uncertainty in currency exchanges in another time; and
>
> ***performing a currency conversion of some portion or all of the transaction from the market currency to the preferred currency*** when the preferred currency is not identical to the market currency, the conversion being performed with the calculated prevailing exchange rate.

'107, 8:45-9:27 (emphasis added). Although Intercurrency alleges in its Complaint that "[n]o single claim is representative of any other" (Compl. ¶ 16), the Court "need not accept as true legal conclusions couched as factual allegations" (and Intercurrency provides no support for its statement in the first place), *Potter v. Cardinal Health 200, LLC.*, 381 F. Supp. 3d 729, 733 (E.D. Tex. 2019) (quoting *Iqbal*, 556 U.S. at 678). In fact, (1) Intercurrency's own allegations in the Complaint and its arguments during prosecution of the Asserted Patents, (2) the fact that the patents share a common specification and are terminally disclaimed against their respective parents, and (3) the substantial overlap in claim language, all confirm the representativeness of '107 claim 1 for purposes of the § 101 analysis. *See PPS Data, LLC v. Jack Henry & Assocs.*, 404 F. Supp. 3d 1021, 1036 (E.D. Tex. 2019) ("The cumulative effect of these three justifications—terminal disclaimer, common specification, and particularized analysis tethered to the claim language—is that JHA has met its burden to initially show representativeness.").

First, in describing the purported inventions of the Asserted Patents, Intercurrency cites only to the common specification and offers a single description of the invention for all three

patents. *See* Compl. ¶¶ 20-23. Likewise, Intercurrency's barebones (and insufficient, *see* § IV0, *infra*) allegations of infringement rely entirely on conclusory language regarding claim 1 of the '107 patent and fail to provide any additional or different allegations for any claim of the '863 or '930 patent. *Compare* Compl. ¶ 38 (paraphrasing claim 1 of the '107), *with* ¶¶ 54, 70 (alleging infringement of the '863 and '930 patents). Moreover, during prosecution of the '107 patent, patentee expressly represented to the Examiner that "***[a]ll of the claims in the present application recite the same claimed invention***, namely a consolidated trading platform involving a trading server, one or more currency exchange servers, and one or more market exchange servers." Ex. D at 2; *see also* Ex. E at 16 ("Without repeating the same, the Applicant wishes to rely upon the above reasoning supporting Claims 1-18 to support Claims 19-36."); Ex. I at 16 (following discussion of claim 1, arguing "[c]laims 9, 19 and 27 have been amended similarly to Claim 1. Without repeating the same, the Applicant wishes to rely upon the above reasons/arguments supporting Claim 1 to support Claims 9, 19 and 27"). Likewise, during prosecution of the '930 patent, the patentee presented arguments directed at claim 1 and then concluded "Independent Claims 5 and 12 have been amended similarly to claim 1. Without repeating the same, the Applicant wishes to rely on the above arguments supporting Claim 1 to support Claims 5 and 12." Ex. L at 11. Thus, at least for the '107 patent and the '930 patent, claims within each patent are indisputably "substantially similar and linked to the same abstract idea." *Content Extraction*, 776 F.3d at 1348 (citation omitted).

Second, this Court recognizes that a "terminal disclaimer offers support for the Court's conclusion regarding representativeness because it 'is a strong clue that a patent examiner and, by concession, the applicant, thought the claims in the continuation lacked a patentable distinction over the parent.'" *PPS Data*, 404 F. Supp. 3d at 1034 (citation omitted). Similarly, "[a] common

specification is some additional indication of representativeness." *Id.* Here, there is no dispute that the patents share a common specification. Likewise, there is no dispute that the claims of the '863 patent are terminally disclaimed against the '107 patent, or that the claims of the '930 patent are terminally disclaimed against both the '107 and '863 patents. *See* Exs. K, M.

Third, the relevant claim language is substantially similar across all three Asserted Patents. For example, patentee argued during prosecution that "[o]ne of the important features or limitations recited in Claim 1 [of the '107 patent] is the specially designed mechanism to derive a prevailing exchange rate from all exchange rates obtained from one or more currency exchange servers." Ex. I at 15. Further, "Claim 1 recites a set of processes or combined actions that must be performed collaboratively by a client computer, one or more currency exchange servers and one or more market exchange servers *to minimize possible uncertainty* from currency exchanges that may considerably affect the price, profit or loss when a transaction related to the asset takes place." *Id.* These same "important" features are recited in the same way in each of the nine independent claims across all three patents.

For example, claims 1 and 9 of the '107 patent recite "a method for providing a consolidated trading platform," while claims 19 and 27 recite a similar "non-transitory computer readable storage medium with an executable software product providing a consolidated trading platform" with a list of "operation[s]" similar to the method steps of claims 1 and 9. Independent claims 1 and 6 of the '863 patent and independent claims 1 and 5 of the '930 patent all recite a "method for trading an asset," while claims 12 of the '930 patent recites a "system for trading an asset," but each requires similar multi-server architecture performing similar steps as '107 claim 1. All nine independent claims require a trading server coupled to market exchange servers and currency exchange servers. All the claims require displaying costs and fees in a preferred currency

using a prevailing exchange rate derived from all exchange rates obtained from the currency exchange servers. All the claims require that the displayed value for the asset changes based on changes in the exchange rate, even when the value of the asset on the market exchange server has not changed.

And, finally, in setting forth its infringement allegations in the Complaint, Intercurrency identifies claim 1 of the '107 patent, claim 1 of the '863 patent, and claim 12 of the '930 patent, as exemplary of Defendants' alleged infringement. Claim 1 of the '107 patent, claim 1 of the '863 patent, and claim 12 of the '930 patent, however, all require the same things: (a) coupling a trading server to one or more currency exchange servers and one or more market exchange servers ('107, 8:47-49; '863, 8:48-50; '930, 8:48-50 and 10:44-45); (b) displaying costs and fees in a currency set by a trader, where the costs and fees are displayed and dynamically updated in accordance with a prevailing exchange rate ('107, 8:64-67; '863, 9:1-4; '930, 10:47-53); (c) conducting a trade of the asset at the prevailing exchange rate at the time of transaction by transmitting a request from the trading server to the market exchange server ('107, 9:5-8; '863, 9:6-9; '930, 10:54-57); and (d) concluding a settlement of the transaction in accordance with market conditions set by the trader ('107, 9:10-13; '863, 9:10-13; '930, 10:47-53 and 10:58-60).

To extent that there are stylistic differences and narrowing limitations in the various independent and dependent claims, they do not reach a degree of legal distinctiveness such that Intercurrency would be deprived "of an adequate day in court." *PPS Data*, 404 F. Supp. 3d at 1033. To the contrary, even Intercurrency realizes the representative nature of the '107 patent in only citing to its claims with any specificity, despite the assertion of three patents in this suit. *Compare* Compl. ¶ 38 (discussing claim 1 of the '107), with ¶¶ 54, 70 (alleging infringement

without reference to claim language). Thus, any differences between the patents are too slight to render the claims patentably distinct for purposes of this analysis.

C.     **During Prosecution of the '107 Patent, Patentee Relied Upon the "Important" Parts of the Invention to Overcome Section 101 Rejections**

During the long prosecution of the '107 patent, which took place from 2007 to 2018, the claims were repeatedly rejected as ineligible under Section 101. Exs. D-I. In response, patentee classified the claims and set forth the "important" features of the invention.

For example, in its January 13, 2015 response, patentee argued "that Claims 1-18 are directed to a method…for trading an asset in a preferred currency [] with a prevailing exchange rate." Ex. E at 14. Then, in its August 13, 2015 response, patentee argued that "Claims 1-36 are directed to facilitating traders in overseas trade, e.g., US securities priced in US dollars in their local currency with a prevailing exchange rate at a minimum cost to the trader." Ex. F at 20. There, patentee conceded that the claims realize a "collaborated operation that happens to be related to a finance-related transaction," but argued that the claims were non-abstract because the "operations involve data distribution, data gathering, data analysis/comparison, data display and data transformation." *Id*. *See also* Ex. G at 13 ("The area of the instant application is indeed related to an economic practice but can only be accomplished with uniquely combined computing technologies."). But by the time it submitted its May 24, 2017 response, the patentee had conceded the abstract nature of the claims: "The Applicant does not intend to argue on the assumption by the Examiner under the Mayo Test Part 1. Therefore the claim appears directed to an abstract idea (Step 2A: YES)." Ex. H at 17.

In its May 24, 2017 and January 20, 2018 responses, the patentee also identified what it considered to be "[o]ne of the important features" of the invention: "how and when the prevailing exchange rate is derived. Claim 1 recites explicitly that the prevailing exchange rate is derived

from all exchange rates obtained from the one or more currency exchange servers when the asset is displayed in the preferred currency." Ex. H at 17; *see also* Ex. I at 15 (stating that "one of the important features…is the specially designed mechanism to derive a prevailing exchange rate from all exchange rates obtained from one or more currency exchange servers"). The goal of the invention, according to patentee's January 20, 2018 response is "*to minimize possible uncertainty* from currency exchanges that may considerably affect the price, profit or loss when a transaction related to the asset takes place." Ex. I at 15. In arguing that the alleged invention is technological, patentee relied expressly "on the speed of processing that can only be afforded by sophisticated computing systems over human methods." *Id.* Finally, relying on the Federal Circuit's nonprecedential decision in *Trading Technologies v. CGQ*, the patentee argued that the invention here is "a Graphical-User-Interface design that helps a trader buy and sell a stock with certainty even the [sic] currency exchange rates fluctuate rapidly." *Id.* at 16.

Likewise, in the subsequent prosecution of the '930 patent, patentee argued the claims are nonabstract because computer-implemented limitations requiring displaying and calculating costs and fees based on the prevailing currency exchange rate "cannot practically be performed in the human mind." Ex. L at 11. Patentee again focused on the timing of the currency exchange calculation as the alleged improvement over the prior art, not any technological improvement:

> "The second prevailing exchange rate is calculated just before an transaction takes place based on the unique architecture to integrate 'an abstract idea' into a practical application in which a trader can be certain how much he/she pays for the transaction regardless how the exchange rate fluctuates (vs. a prior art system in the which a trader waits till the end of the day for the exchange rate, which may result in significant fluctuation in the cost and fees)."

*Id.* The '930 claims were subsequently allowed without further rejection.

Section 101 was not addressed during the prosecution of the '863 patent, but the claims there were initially rejected on the ground of nonstatutory obviousness-type double patenting over

the '107 patent claims because the Examiner determined they "are not patentably distinct" from the patent application's claims. Ex. J at 3. The '863 patent was subsequently allowed after the patentee filed a terminal disclaimer. Ex. K.

### D.   *Alice* Step One: The Claims Are Impermissibly Abstract

The claims of the Asserted Patents are directed to an abstract idea—trading an asset in a preferred currency, and in particular, to performing a currency exchange at the time of transaction for a security transaction—and not a technological solution to a technical problem. As the specification explains, "[a]t the time of buying or selling the stocks, as well as during the whole period the investor held the stocks, the investor had no certain knowledge of what profit or loss he was going to get." '107, 1:53-57. Thus, "[t]here is a great need for an improved system which performs currency conversion at a transactional level so that a trader or investor knows exactly what profit or loss may occur with a transaction." *Id.* at 1:61-66.

During prosecution, Intercurrency conceded that the claims are directed to economic activity and, in particular, to "trading an asset in a preferred currency." Ex. E at 14; *see also* Ex. F at 20 (claims "directed to facilitating traders in overseas trade…in their local currency"). Likewise, when identifying the important aspects and alleged novelty of the invention, Intercurrency argued to the Patent Office that "[o]ne of the important features in Claim 1 as amended is how and when the prevailing exchange rate is derived." Ex. H at 17; Ex. I at 14-15 ("one of the important features or limitations…is the specially designed mechanism to derive a prevailing exchange rate from all exchange rates obtained from one or more currency exchange servers"); Ex. L at 11. ("second prevailing exchange rate is calculated just before an transaction takes place" in contrast to "a prior art system in the which a trader waits till the end of the day for the exchange rate"). While Intercurrency eventually secured allowance of the claims by arguing that the invention is "a Graphical-User-Interface design that helps a trader buy and sell a stock with certainty," Ex. I at

16, this too relies entirely on the resultant business benefits—providing certainty in a transaction—not any technological improvement to any underlying platform. But regardless of whether the claims are directed to (1) currency exchange or (2) "a Graphical-User-Interface design," the claims are impermissibly abstract for multiple independent reasons.

### 1.     Fundamental Economic Concepts Are Ineligible

The Supreme Court, Federal Circuit, and courts in this district all agree that fundamental economic concepts—such as trading an asset in a preferred currency—are, without more, patent ineligible. For example, in *Alice* itself, the Supreme Court invalidated computer-implemented claims directed to "the concept of intermediated settlement [which] is 'a fundamental economic practice long prevalent in our system of commerce.'" *Alice*, 573 U.S. at 219 (citation omitted). Likewise, in *Bilski v. Kappos*, the Supreme Court found the concept of hedging risk patent ineligible. 561 U.S. at 611. The Federal Circuit addressed economic concepts in multiple cases, each time finding the patents ineligible even when reciting computer hardware and computer-implemented steps because "the 'investment' character of this information simply invokes a separate category of abstract ideas involved in *Alice* and many of our cases—'the creation and manipulation of legal obligations such as contracts involved in fundamental economic practices.'" *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018) (collecting cases); *see also OIP Techs.*, 788 F.3d at 1362-63 (finding concept of "'offer based pricing'…similar to other 'fundamental economic concepts' found to be abstract ideas by the Supreme Court" and the Federal Circuit).

This Court also recognizes the ineligibility of fundamental economic activities. For example, in *Island Intellectual Property LLC v. TD Ameritrade, Inc.*, this Court invalidated claims directed to cash management because "[l]ike the alleged innovation in the *InvestPic* patent…the purported innovation in 'cash management'…concerns the abstract idea of fundamental economic

and accounting activities itself, which is not sufficient to confer eligibility." 2:21-CV-00273, 2022 WL 17080738, at *2 (E.D. Tex. Nov. 17, 2022) (citation omitted). And Judge Bryson, while sitting by designation in this judicial district, confirmed the ineligibility of claims directed to "the unpatentable concept of currency exchange." *Loyalty Conversion*, 66 F. Supp. 3d at 837 ("[C]lose examination of the asserted claims shows that they are largely functional in nature and do little more than set forth the general concept of currency exchange…and then announce the use of 'one or more' computers to obtain various efficiencies in the process…."). *Id*. at 837-38.

Even assuming that it was novel and non-obvious to calculate a prevailing exchange rate at the time of a transaction using all exchange rates obtained from one or more currency exchange servers, this cannot save the claims from abstraction. As the Federal Circuit has explained, "[n]o matter how much of an advance in the finance field the claims recite, the advance lies entirely in the realm of abstract ideas, with no plausibly alleged innovation in the non-abstract application realm. An advance of that nature is ineligible for patenting." *SAP Am.*, 898 F.3d at 1163 (finding claims ineligible when "[t]heir subject is nothing but a series of mathematical calculations based on selected information and the presentation of the results of those calculations"). Indeed, "[w]here a claim's 'essential advance' is abstract, a novel method of performing that advance 'does not avoid the problem of abstractness.'" *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 892 (Fed. Cir. 2019) (non-precedential) (citation omitted); *see also In re Greenstein*, 774 F. App'x 661, 665 (Fed. Cir. 2019) (non-precedential) (rejecting argument that "confuses eligibility with novelty" and explaining that "the alleged novelty of Greenstein's investment strategy—an abstract idea—is immaterial to the claims' eligibility"); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138 , 1151 (Fed. Cir. 2016) ("[A] claim for a *new* abstract idea is still an abstract idea."). Accordingly, Intercurrency's claims are indisputably directed to abstract economic concepts.

## 2.    Intercurrency's Prosecution-Based "Graphical User Interface" Argument Does Not Render the Claims Non-Abstract

Re-packaging the claims as directed to a "graphical-User-Interface design" does not make the claims non-abstract and technological. Indeed, the Federal Circuit addressed this argument directly in two precedential decisions, finding similar claims patent-ineligible. In *Trading Technologies International Inc. v. IBG LLC* ("*IBG I*"), the Federal Circuit affirmed the ineligibility under Section 101 of claims directed "a graphical user interface ("GUI") for electronic trading." 921 F.3d 1084, 1087 (Fed. Cir. 2019). There, the Federal Circuit "[saw] no technological invention in this software method for trading [because t]he claims require receiving bid and offer information from an electronic exchange, displaying such information…and sending an order to the electronic exchange based on a user input." *Id.* at 1089. The Federal Circuit rejected patentability arguments that the patents "addressed problems related to speed, efficiency, and usability" because "[t]his invention makes the *trader* faster and more efficient, not the computer. This is not a technical solution to a technical problem." *Id.* at 1089-90. Here, too, "the claims…do not improve the functioning of the computer, make it operate more efficiently, or solve any technological problem. Instead, they recite a purportedly new arrangement of generic information that assists traders in processing information more quickly." *Id.* at 1093.

Similarly, in *IBG II*, the Federal Circuit addressed related patents that patentee argued were not abstract "because they provide a particular graphical user interface that improves usability, visualization, and efficiency." *IBG II*, 921 F.3d at 1384. The Federal Circuit rejected this argument as well because "[t]he claims are focused on providing information to traders in a way that helps them process information more quickly…not on improving computers or technology." *Id.* Like *Electric Power*, the purported advance "is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive

technology for performing those functions." *Id*. at 1384-85 (quoting *Elec. Power Grp.*, 830 F.3d at 1354).

The Federal Circuit's reasoning in both *IBG I* and *IBG II* confirms that the asserted claims are unpatentable. Like the claims at issue in those cases, the claims here merely recite functional limitations for receiving and transmitting information about assets and currencies, calculating (analyzing) information of a specified content, and displaying the results of those calculations. *See* § III.B, *supra*. As Intercurrency concedes, the purported improvement over the prior art is "<u>how and when</u>" those calculations are performed (Ex. H at 17; *see also* Ex. I at 14-15; Ex. L at 11), not on any improvement to the underlying servers or client computers that perform those operations. Indeed, *IBG II* makes clear that "merely providing a trader with new or different information in an existing trading screen is not a technical solution to a technical problem. Instead, it focuses on improving the trader, not the functioning of the computer." *IBG II*, 921 F.3d at 1383. The claims here are no different.

The non-precedential *Trading Technologies International, Inc. v. CQG, Inc.* case relied on by Intercurrency during prosecution of the '107 patent is non-binding (and distinguishable). *See* Ex. I at 16;[2] *Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F. App'x 1001 (Fed. Cir. 2017) (non-precedential). Indeed, the later *IBG I* court expressly rejected the argument that it was bound by the non-precedential *Trading Techs.* decision. *IBG I*, 921 F.3d at 1095 ("TT argues that because

---

[2] Contrary to Intercurrency's erroneous assertion in the Complaint, it is irrelevant whether "any arguments relating to eligibility…are necessarily merely cumulative with those already considered, and rejected, by the Patent Examiners in allowing the Patents-in-Suit." Compl. ¶24. As the Federal Circuit has explained, "courts are not required to defer to Patent Office determinations as to eligibility," even in the face of "evidence that the Patent Office concluded, in allowing the [challenged] patent, that the claimed inventions improve…device technology itself." *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 705 (Fed. Cir. 2023) (citing *OIP Techs.*, 788 F.3d at 1362 ("Patent eligibility under 35 U.S.C. § 101 is an issue of law reviewed de novo.")).

non-precedential decisions of this court held that other TT patents…claimed eligible subject matter, we should too. We are not bound by non-precedential decisions at all, much less ones to different patents, different specifications, or different claims."). But more fundamentally, *CGQ* is inapposite. There, the claims required "a specific, structured graphical user interface *paired with a prescribed functionality directly related to the graphical user interface's structure*." *CGQ*, 675 F. App'x at 1004 (emphasis added). Here, there is no such required structure for the graphical user interface, nor is there any claimed functionality related to any such structure. Accordingly, like the claims in *IBG I* and *IBG II*, the claims of the Asserted Patents here recite nothing more than an abstract idea designed to improve traders and not any underlying technology.

Finally, the claims here use "essentially result-focused, functional…claim language [which] has been a frequent feature of claims held ineligible under § 101, especially in the area of using generic computer and network technology." *Elec. Power Grp.*, 830 F.3d at 1356. Indeed, because the claims here do not even purport to specify *how* any of its functional results are achieved (i.e., how to "determine[]" or "derive[]" a prevailing exchange rate or how to "dynamically change[]" the displayed costs and fees), they cannot escape abstraction. *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 533 (Fed. Cir. 2020) (non-precedential) ("The patent has to describe how to solve the problem in a manner that encompasses something more than the 'principle in the abstract.'"); *cxLoyalty, Inc. v. Maritz Holdings*, 986 F.3d 1367, 1378 (Fed. Cir. 2021) ("[T]he claims provide no useful guidance as to *how* this purported function is achieved and thus cannot be directed to a technological solution.") (emphasis added); *Am. Axle & Mfg., Inc. v. Neapco Holdings*, 967 F.3d 1285 (Fed. Cir. 2020). Even the specification lacks detail on how to accomplish many of the claimed limitations, including the requirement that "the trading server is configured to calculate the prevailing exchange rate from all exchange rates obtained

from the one or more currency exchange servers." '107, 9:14-16. Rather, as taught in the specification, "a prevailing exchange rate is obtained at **306** from a currency exchange." '107, 5:48-49.

Putting aside concerns surrounding written description and enablement, this lack of detail is particularly troubling in the Section 101 context given Intercurrency's prosecution arguments that "the trading server recited in Claim 1 ***must*** be specifically programmed to work with a currency exchange server and a market exchange server[and] ***must*** be configured to perform a series of data manipulation operations to obtain a prevailing exchange rate from the currency exchange server before the transaction takes place." Ex. E at 15. Thus, even under Intercurrency's own views of the technology, because no claim recites details on the "series of data manipulation operations" necessary to derive a prevailing exchange rate, the claims do not explain how to solve any problem "in a manner that encompasses something more than the 'principle in the abstract.'" *Dropbox*, 815 F. App'x at 533. The claims of all three Asserted Patents fail at *Alice* Step One.

### E.    *Alice* Step Two: There Is No Inventive Concept in the Claims Beyond the Abstract Idea Itself

The claims of the Asserted Patents require, at most, conventional hardware—a "client computer," a "trading server," one or more "market exchange servers," and one or more "currency exchange servers"—for carrying out the abstract idea of currency exchange at the time of a transaction. *See, e.g.*, '107, 8:45-9:27. Indeed, the specification admits that these conventional components are well-known in the industry for use in financial transactions: "server 206 represents a bank [or] an exchange agency"; "server 208 represents a brokerage (e.g., Scottrade) to facilitate a transaction decided by a trader"; and "server 210 represents an asset or market exchange (e.g., NYSE), where an asset is caused to change hands." *Id*. at 4:66-5:6. Likewise, the "client machine may include…any form of desktop or laptop or server computer, handheld wireless device, or

mobile phone." *Id.* at 4:50-53. As *Alice* itself makes clear, "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223.

Indeed, the patentee conceded during prosecution that "the additional features, when viewed individually, are merely 'generic computer and networking components performing generic computer and networking functions.'" Ex. H at 17-18. Instead, the patentee argued that the claims recite an inventive concept in the combination of elements requiring that "the prevailing exchange rate is derived or calculated from all exchange rates…at a specific location (i.e., the trading server), remote from the end-user[and] the timing of the operation (i.e., when the asset is displayed and right before the transaction takes place) confines an abstract idea to a particular and practical application of the abstract idea." *Id*. at 18. In its final response to the Patent Office, the patentee relied on "the fact that there are no more 35 USC 102 or 103 rejections again [sic] the claims" to argue that "[t]his means the claims as a whole amounts to significantly more than the abstract idea plus the details to implement the abstract idea on one or more generic computers." Ex. I at 16. But these patentability arguments fail as a matter of law.

As the Federal Circuit made clear in *SAP*:

> We may assume that the techniques claimed are "[g]roundbreaking, innovative, or even brilliant," but that is not enough for eligibility. Nor is it enough for subject-matter eligibility that claimed techniques be novel and nonobvious in light of prior art, passing muster under 35 U.S.C. §§ 102 and 103…. The claims here are ineligible because their innovation is an innovation in ineligible subject matter. Their subject is nothing but a series of mathematical calculations based on selected information and the presentation of the results of those calculations…. No matter how much of an advance in the finance field the claims recite, the advance lies entirely in the realm of abstract ideas, with no plausibly alleged innovation in the non-abstract application realm. An advance of that nature is ineligible for patenting.

*SAP*, 898 F.3d at 1162 (internal citations omitted); *Synopsys, Inc.*, 839 F.3d at 1151 ("[A] claim for a *new* abstract idea is still an abstract idea. The search for a § 101 inventive concept is thus

distinct from demonstrating § 102 novelty."). Accordingly, Intercurrency's arguments fall short because the alleged innovations they identify—"how and when" a prevailing exchange rate is calculated—remain abstract, and the claims therefore lack any inventive concept.

Likewise, Intercurrency cannot rely on the efficiency of a computer to support an inventive concept. As this Court confirmed, "'the alleged efficiency of the method through computerization,'…is not enough to confer patent eligibility." *Miller Mendel*, 598 F. Supp. 3d at 498 (quoting *SkillSurvey*, 178 F. Supp. 3d at 258 ("It is inarguable that using computer technology would necessarily make the claimed method more efficient. However, adding efficiency to a long-standing process through computerization also does not render an abstract idea patentable.")). "[T]he problem being solved by the use of computer technology does not solve a specific computing problem." *Id.*

Similarly, limitations requiring that the display of "all costs and fees are dynamically changed in accordance with the prevailing exchange rate" (e.g., '107, 8:65-67) also cannot provide an inventive concept to save the claims from abstractness. For example, in *IBM Corp. v. Zillow Group, Inc.*, the Federal Circuit held that "dynamically altering visual characteristics" of a computer display is not inventive, because "that dynamic re-layering or rematching could also be performed by hand, though more slowly." 50 F.4th 1371, 1382 (Fed. Cir. 2022). "Any of the patent's improved efficiency comes not from an improvement in the computer but from applying the claimed abstract idea to a computer display." *Id.*

Finally, claim construction is unnecessary to resolve this issue because Intercurrency cannot "articulate how adoption of the construction [for any proposed claim term] would materially impact the analysis at step one (and/or at step two)." *Sanderling*, 65 F.4th at 704 ("If claims are directed to ineligible (or eligible) subject matter under all plausible constructions, then

the court need not engage in claim construction before resolving a Section 101 motion.").

## IV. THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE PLAUSIBLE FACTS SUFFICIENT TO SUPPORT A CLAIM FOR INFRINGEMENT

In the alternative, the Court should dismiss the Complaint for failure to plead "factual content that allows the court to draw the reasonable inference that [State Street] is liable for the misconduct alleged," based on "more than a sheer possibility that [State Street] has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). In particular, Intercurrency's Complaint fails to include sufficient factual allegations that reasonably suggest State Street meets any of the allegedly important features identified by Intercurrency as supporting the alleged eligibility of the Asserted Patents.

As this Court has noted, for claims "directed to 'hardware and software involved in an electronic transaction…system,'" *Fractus*, 2021 WL 2483155, at *2, a Complaint must include more than the bare bones allegations found sufficient by the Federal Circuit in the *Disc Disease* case, *Chapterhouse*, 2018 WL 6981828. This Court's rulings in *Chapterhouse* (finding Complaint deficient) and *Fractus* (finding Complaint sufficient) are instructive. In *Chapterhouse*, this Court dismissed several counts of direct infringement for patents directed to "hardware and software involved in an electronic transaction receipt system" because the plaintiff failed to include sufficient factual allegations. 2018 WL 6981828, at *2. While the complaint there listed an exemplary claim from each patent and included supporting screenshots of the defendant's software product, it did not include descriptive paragraphs explaining those screenshots or connecting them to the claim language. *Id.* In contrast, in *Fractus*, the Complaint "describe[d] the accused products in a manner that corresponds [to] the asserted claims." 2021 WL 2483155, at *3. Moreover, the Complaint in *Fractus* "include[d] both images of the accused structures and descriptive paragraphs." *Id.* Nonetheless, despite finding "Fractus's allegations…sufficient as a technical

matter, the Court [did] share some of TCL's concerns," recognizing that inventions that are "necessarily abstract and inherently intangible as the software-based system claims in *Chapterhouse*" might require a higher pleading standard than was required for *Fractus*. *Id.*

Here, Intercurrency's allegations do not meet even the "somewhat thin" standard found sufficient in *Fractus*, let alone the heightened standard called for in *Chapterhouse*. The Complaint includes only one generic paragraph identifying the "Charles Rivers River Investment Management Solution trading platforms and systems" without any explanation for why this accused instrumentality allegedly infringes any asserted claim of the Asserted Patents. Compl. ¶ 33. Indeed, Paragraph 38 contains a rote recitation of Claim 1 of the '107 patent but does not include any specifics on how State Street has infringed those elements. Compl. ¶ 38. While Intercurrency includes screenshots, it fails to provide any description of how those screenshots relate in any way to the patent claims Intercurrency contends were infringed. Even the marketing materials Intercurrency attaches to their Complaint don't contain the claim limitations broadly alleged in Paragraph 38. There is no mention of trading servers, currency exchange servers, or market exchange servers; no currency preferences; nor any indication of when or how often exchange rates are calculated. Intercurrency's included screenshots, without supporting factual allegations that arise to more than mere conclusory statements, fail to meet the *Iqbal*/*Twombly* pleading standard. *See Chapterhouse*, 2018 WL 6981828, at *2.

Intercurrency's silence is particularly problematic given the Federal Circuit instruction to consider, inter alia, "the materiality of any given element to practicing the asserted claim(s)" in determining the appropriate level of detail required. *Bot M8*, 4 F.4th at 1353. In applying this "materiality" inquiry to particular limitations, courts consider whether "the relevant prosecution history and the [c]omplaint suggest that these limitations capture the point of novelty." *Vervain,*

*LLC v. Micron Tech., Inc.*, No. 6:21-CV-00487, 2022 WL 23469, at \*5 (W.D. Tex. Jan. 3, 2022). This is important because, without allegations directed to the points of novelty used to traverse the prior art during prosecution, the Complaint "begs the 'obvious alternative explanation' that the accused infringer is merely practicing the prior art." *Id*. (quoting *Twombly*, 550 U.S. at 567).

Here, Intercurrency argued during prosecution that "one of the important features in Claim 1 [of the '107 patent] is <u>how and when</u> the prevailing exchange rate is derived. Claim 1 recites explicitly that the prevailing exchange rate <u>is derived from all exchange rates</u> obtained from the one or more currency exchange servers [and] <u>is calculated again from all exchange rates</u>…right before the transaction takes place." Ex. H at 17. These features—according to Intercurrency itself—ensure that the claims "do[] not pose a risk tying up the alleged abstract idea nor pre-empting others from using the alleged abstract idea." Ex. G at 16. Likewise, Intercurrency's amendments required that the displayed "costs and fees are dynamically changed in accordance with the prevailing exchange rate constantly updated, a value of the asset being displayed changes as the exchange rate changes, even when a market value of the asset remains unchanged." Ex. I at 5. According to Intercurrency, "[i]n view of the above amendments…it is believed that the pending Claims 1-36 shall be in condition for allowance over the cited references." *Id.* at 17. Given the apparent importance of these features during prosecution and Intercurrency's assurances that the claims do not pre-empt others from engaging in foreign exchange transactions, Intercurrency has no excuse for its deficient allegations.

## V.   VENUE IS IMPROPER IN THE EASTERN DISTRICT OF TEXAS

To the extent that Intercurrency's Complaint alleges anything at all, these allegations are not related to the Eastern District of Texas. In patent infringement cases, venue is only proper "in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). A domestic

corporation—like State Street—resides only in its state of incorporation. *See TC Heartland*, 581 U.S. 258 at 269. There is no dispute that State Street is incorporated in Massachusetts, thus the validity of Intercurrency's venue contentions rely on proving that State Street has a "regular and established place of business" in the Eastern District of Texas, which Intercurrency cannot do. *See Celgene Corp. v. Mylan Pharms. Inc.*, 17 F.4th 1111, 1119 (Fed. Cir. 2021) (plaintiff has burden of establishing proper venue under 28 U.S.C. § 1400).

As the Federal Circuit explained in *In re Cray Inc.*, a "regular and established place of business" for venue purposes requires "(1) there must be a physical place in the district; (2) [that is] a regular and established place of business; and (3) [is] the place of the defendant." 871 F.3d 1355, 1360 (Fed. Cir. 2017). Without satisfying each of these requirements, venue is "improper under § 1400(b)." *Id.* Intercurrency cannot prove any of these requirements—let alone all three—rendering venue in the Eastern District of Texas improper.

### A.      State Street Has No Physical Place in the Eastern District

Intercurrency must show that State Street has a "building or a part of a building set apart for any purpose" from which business is conducted. *In re Cray Inc.* at 1362. This place cannot be virtual or established solely through electronic communications, it must be a "physical, geographical location in the district from which the business of the defendant is carried out." *Id.* State Street has no such location in the District. State Street is both incorporated and headquartered in Massachusetts. And while State Street Corporation has office locations in several cities within the United States, there is no office located within the District. *See* Declaration of Jeremy Kream ("Kream Decl."), ¶¶ 3-8.

It is not enough that an employee of the defendant is located in a district or conducted business therein, the defendant themselves must establish the place where the employee worked to meet this requirement. *Id.* at 1366. An employee's presence in the district by itself, without

additional indicia, is not sufficient to establish the defendant's "physical place" within the district. *Compare In re Cordis Corp.*, 769 F.2d 733, 735 (Fed. Cir. 1985) (venue proper where sales representatives in district stored employer's products in home for sales meetings in district) *with Celgene Corp.*, 17 F.4th at 1123 (roster of employees and LinkedIn profiles mentioning district insufficient to establish physical location of defendant in district).

Here, Intercurrency does not allege sufficient facts to establish a physical location of State Street within the District. Contrary to Intercurrency's unsupported allegations (*see* Compl. ¶ 7), State Street does not own or operate data servers in the Eastern District of Texas. Kream Decl., ¶¶ 6, 8. And State Street's remote employees currently residing in the Eastern District of Texas are not sufficient to establish a physical location for State Street within the District. *See* § V.B, *infra*. Intercurrency's vague and conclusory assertions of State Street employees "possess[ing] inventory" and "sample products" (Compl. ¶ 10) appear designed to establish venue in the theoretical, but Defendants are at a loss to understand to what "inventory" and "sample products" Intercurrency refers as these things do not exist in State Street's business of banking and finance. Regardless, State Street employees residing within the District are not required to and do not hold product inventory in their homes, nor do they deliver sample products to customers in the District. Kream Decl., ¶ 12. Intercurrency likewise does not provide any factual evidence in support of its conclusory allegation that "Defendant has further solicited employees in public advertisements to cover the challenged venue area and preferred that those employees live in their assigned area." Compl. ¶ 11. Defendants are not aware of any such advertisements. Kream Decl., ¶ 13.

### B.   State Street Has No Regular and Established Place of Business Within the Eastern District

The second *Cray* factor requires that an employee is conducting business at the defendant's "physical, geographical location" within the district. *In re Google LLC*, 949 F.3d 1338, 1343-44

(Fed. Cir. 2020). Again, it is not enough that some employees are present in the district; their presence must be at the defendant's regular and established place of business, conducting the defendant's business. *Id.* In this context, courts have interpreted "established" to mean "stable" and not transient in nature. *See In re Cray*, 871 F.3d at 1363. Where an employee can move their home out of the district on their own accord and with no contentions from the defendant, this "cut[s] against the employee's home being considered a place of business of the defendant." *Id.*

State Street employees in the Eastern District of Texas are remote employee who work out of their homes of their own accord. Kream Decl., ¶ 9. These homes are not owned, operated, or rented by State Street. *See id.*, ¶¶ 5, 7, 9-11. The employees' presence in the District is not a requirement of employment by State Street, and they are under no obligation to continue residency within the District to maintain employment by State Street. *Id.*, ¶ 9. Intercurrency has offered no evidence or allegations sufficient to establish that State Street has a regular physical presence inside the homes of State Street's remote employees residing in the Eastern District, nor are they able to. Thus, Intercurrency fails to prove the second *Cray* factor as State Street has no regular and established place of business within the Eastern District of Texas.

### C.   State Street Exerts No Control Over any "Place" in the Eastern District of Texas

The third *Cray* factor requires the plaintiff to show that the place of business used to establish venue is a place of the defendant. The Federal Circuit has outlined a number of factors relevant to this analysis including

> "(1) whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place; (2) whether the defendant conditioned employment on an employee's continued residence in the district or the storing of materials at a place in the district so that they can be distributed or sold from that place; (3) a defendant's representations about that place, including advertisements; and (4) the nature and activity of the alleged place of business of the defendant in the district in comparison with that of other places of business of the defendant in other venues."

*Celgene Corp.*, 17 F.4th at 1122 (quoting *In re Cray*, 871 F.3d, at 1363-64). Put simply, the place in the district must be a place "*of the defendant*, not solely a place of the defendant's employee." *In re Cray Inc.*, 871 F.3d at 1363. Any such place of business must be "established or ratified" by the defendant, an employee cannot do this on their own. *Id.*

The third *Cray* factor is particularly fatal to Intercurrency's claim. Beyond a general assertion that State Street has employees in Plano, Texas, Intercurrency has failed to allege any specifics sufficient to meet this factor. As noted above, Intercurrency has not identified any alleged "place" State Street has established as a regular place of business within the District. To the extent Intercurrency attempts to establish venue through State Street's employees in the Eastern District, Intercurrency fails to allege that State Street has exerted sufficient possession or control over State Street employee's homes to meet the place of business requirements of *Cray*. State Street does not advertise the addresses of their employees in the District, nor do they hold these locations out as State Street business locations. *See* Kream Decl., ¶¶ 5, 7, 13. There is nothing to suggest that State Street has "established" or "ratified" their employees' homes as State Street locations, nor do these homes represent typical State Street business locations. Indeed, any State Street employee residing in the Eastern District of Texas is free to move out of the District without affecting their employment status with State Street. *Id.*, ¶¶ 9, 13. Because State Street has no physical presence in the District, and exerts no control over any aspect of their Eastern District employee's homes as physical locations for regular State Street business, Intercurrency cannot point to State Street employees as the basis for establishing venue within the Eastern District of Texas.

Without a "place of the defendant" located within the Eastern District, Intercurrency's Complaint fails on improper venue grounds.

## VI.    CONCLUSION

For at least these reasons, the Court should dismiss Intercurrency's Complaint.

Respectfully submitted,

Dated:  April 15, 2024

*/s/ Melissa R. Smith*

Kevin J. Post
(NY Bar No. 4382214)
(Eastern District of Texas Member)
**ROPES & GRAY LLP**
1211 Avenue of the AmericasNew
York, NY 10036 Telephone: (212)
596-9000
Facsimile: (212) 596-9090
kevin.post@ropesgray.com

Melissa R. Smith
State Bar No. 24001351
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas  75670
Tel: (903) 934-8450
Fax: (903) 934-9257
melissa@gillamsmithlaw.com

## CERTIFICATE OF COMPLIANCE WITH THE COURT'S
## 35 U.S.C. § 101 MOTION PRACTICE ORDER

The parties **disagree** on whether prior claim construction is not needed to inform the Court's analysis as to patentability.

*/s/ Melissa R. Smith*

## CERTIFICATE OF SERVICE

The undersigned certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this 15th day of April 2024.

*/s/ Melissa R. Smith*

